[Cite as *In re R.T.*, 2016-Ohio-8490.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 104369**

# IN RE: R.T.

# Minor Child

[Appeal by Father, P.P.]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 14901109

**BEFORE:** Stewart, P.J., Blackmon, J, and Laster Mays, J.

**RELEASED AND JOURNALIZED:** December 29, 2016

**ATTORNEY FOR APPELLANT**

Susan J. Moran
55 Public Square, Suite 1616
Cleveland, OH 44113


**ATTORNEYS FOR APPELLEE**

**For C.C.D.C.F.S.**

Timothy J. McGinty
Cuyahoga County Prosecutor

Joseph M. Cordiano
Assistant County Prosecutor
C.C.D.C.F.S.
4261 Fulton Parkway
Cleveland, OH 44144

**Guardian Ad Litem for the Child**

Amy L. Nash
1180 Winston Road
South Euclid, OH 44121

**Also Listed**

A.L., pro se
4296 Warner Road
Cleveland, OH 44105

MELODY J. STEWART, P.J.:

{¶1} P.P. appeals from an order of the common pleas court, juvenile division, terminating his parental rights and placing his son, R.T., in the permanent custody of appellee Cuyahoga County Division of Children and Family Services ("CCDCFS"). For the reasons that follow, we affirm.

{¶2} In February 2014, R.T. was removed from his mother's custody and placed in the emergency, temporary custody of CCDCFS at three days-old after testing positive for cocaine and marijuana when he was born. R.T.'s mother also had her parental rights terminated in the proceedings below, but is not a party to this appeal.

{¶3} In March 2014, P.P. established himself as R.T.'s biological father and worked with CCDCFS to have his brother and his brother's wife be foster parents to R.T. while P.P. completed a case plan designed by CCDCFS with the ultimate goal of unifying R.T. with P.P. In February 2015, CCDCFS moved for an extension of temporary custody in order to give P.P. additional time to complete his case plan. The court granted the motion. At the end of July, CCDCFS moved for permanent custody of R.T. The court scheduled a trial on the motion for December 3, 2015, but for reasons not attributable to P.P., the trial date was continued twice to March 10, 2016.

{¶4} Nine witnesses testified at the hearing, including P.P., the uncle and aunt foster parents, R.T.'s guardian ad litem, and the CCDCFS social worker assigned to R.T.'s case. A summary of the testimony follows.

**{¶5}** Shauna Young testified first. Young explained to the court that she works for CCDCFS as a social worker and has been assigned to R.T.'s case since February 2014. She stated that after R.T. came into the care of CCDCFS, she began working with P.P. on a case plan for reunification. As part of his case plan, P.P. was required to complete outpatient drug treatment and obtain treatment to address certain mental health concerns, including issues regarding anxiety and depression. Also, because at the initiation of his case plan P.P. was living alone in a home without any legal working utilities, part of P.P.'s case plan involved taking the necessary steps to have utilities turned on in his home, which included paying his $2,500 sewer and water bill, and updating his electrical box.

{¶6} Young testified that P.P. successfully completed the drug treatment portion of his plan. Nevertheless, Young maintained concerns about P.P.'s mental health at the time of the hearing. Young explained that P.P. was at times hostile and would often become agitated and confrontational with her and his brother's family. According to Young, P.P. did not respect boundaries and engaged in irrational thinking. To highlight these concerns, Young explained an incident where during a visit with his son, P.P. began screaming at his brother to the point where their mother had to ask him to stop. Young also explained how the agency had to discontinue P.P.'s visits at the uncle's home in October 2014 because P.P. did not respect the uncle's boundaries and got into arguments with the family. For instance, Young related an incident where P.P. took the baby from his brother's wife because she did not hand the baby over quickly enough, and further explained how she had to ask P.P. to stop calling the brother at inappropriate times during the evening. Young also described a time when she and her supervisor visited P.P.'s home in January 2016 when they had to leave abruptly for safety concerns after P.P. became hostile. Young testified that P.P.'s previous counselor reported that P.P.'s anxiety and depression created barriers for P.P. that made it hard for him to comply with expectations. Young also testified that P.P.'s hostile and irrational behavior was not as apparent in the beginning of his case plan, but worsened after the agency filed for permanent custody.

{¶7} Although P.P. could be hostile with other adults, Young testified that he was not hostile in his interactions with R.T., and for the most part, had appropriate interactions with his son. According to Young, the reports from P.P.'s visitation coach were positive and showed P.P. to be engaged and interested in learning how to care for R.T. Young testified that R.T. runs to P.P. when he sees him and calls P.P. daddy — though Young did clarify that R.T. also refers to the uncle as daddy. Young explained however, that R.T. is a special needs child and has certain dietary restrictions and sensory issues. Because of this, R.T. receives physical therapy and occupational therapy and undergoes treatment at two facilities dedicated to helping children with special needs. One of these facilities, the Galvin Institute, is dedicated to treating children with autism — an early, undiagnosed, but potential concern for R.T.

{¶8} Young further related some concerns she had over P.P.'s ability to care for his special needs son. For instance, she described a time when P.P. attempted to feed R.T., who is lactose intolerant, ice cream. When Young explained to P.P. that R.T. could not eat such foods because they made him ill, P.P. said he was only going to give him a few bites. According to Young, she then had to intervene and stop him from feeding the child the ice cream. Another example she gave involved a weighted vest that R.T. wears to keep calm. During one particular visit, P.P. loosened his son's vest because he thought R.T. looked uncomfortable, despite Young's explaining its use and asking P.P. not to do so. Minutes later, when R.T. became upset and started screaming, P.P. made a passing comment about how temperamental his son could be. Young had to explain that the changed behavior was likely caused by the loosening of the vest, and that R.T. needed to wear the vest properly for it to work.

{¶9} In addition to these concerns about P.P.'s mental health and ability to appreciate and care for R.T.'s special needs, Young remained concerned with P.P.'s inability to maintain working utilities. Young testified that at the beginning of his case plan, P.P. had no running water, sewage, gas, or electricity at his home, which were reasons that R.T. could not be immediately placed with him. Although P.P. succeeded in getting his electricity turned on, he was not able to get the water turned on until August 2015 because of his outstanding water bill. According to Young, in July 2015, which was five months in to a six-month extension on temporary custody, she learned that P.P. had removed the gas furnace from his home and not yet replaced it. P.P. told Young that he intended to purchase an electric furnace so that he would not have to deal with the gas company anymore. When Young explained that these things needed to be fixed before R.T. could be placed in his home, P.P. got agitated and said that he was not being given enough time to make the improvements. Young admitted that P.P. had rectified the utility issues as of the date of the hearing. Young also testified that P.P. has an outstanding property tax bill in the amount of $2,700. Notwithstanding her concerns over the tax and utility issues, Young's testimony was generally complimentary of P.P.'s home. She testified that P.P. kept an appropriately furnished and clean house and that P.P. set up a room for R.T. with appropriate furnishings and toys.

{¶10} P.P.'s income and employment status were also concerns for the agency. P.P. is an independent contractor who works odd jobs and irregular hours. The jobs include roofing, plumbing, and electrical repair. Young testified that from the beginning of the process, the agency requested that P.P. obtain stable employment. She further testified that although P.P. has supplied her with receipts from various jobs he had worked, she was unable to verify those receipts. Young testified that P.P.'s 2015 tax return reported $7,000 in income. Young's testimony also focused on R.T.'s aunt and uncle foster parents. According to Young, the aunt and uncle are committed to R.T.'s care and are seeking to adopt him. Young testified that the aunt and uncle have two children, ages 6 and 18 months, living in the home. R.T., who has been living with his foster relatives since he was two-months old, receives treatment for his special needs in their home once a week. The uncle works for a company where he has secure and steady employment while his wife stays at home and cares for the children. According to Young, the aunt is R.T.'s primary caregiver and has been for the majority of R.T.'s life. She keeps R.T. on a strict routine that is needed for R.T. to feel comforted despite his sensory issues. Young further testified that R.T. appears to be very comfortable and functioning well in his aunt and uncle's home.

{¶11} Ultimately, Young opined that she believed it was in R.T.'s best interest for the court to grant permanent custody to CCDCFS so that the aunt and uncle could adopt him. Young's recommendation was based on her remaining concerns about P.P.'s erratic behavior, his inability to maintain lasting and stable employment, and whether he would be able to provide day-to-day care for R.T. Her recommendation was further based on the fact that the aunt and uncle had been providing excellent care to R.T., and that R.T. was firmly entrenched as a member of their family.

{¶12} The uncle's testimony reiterated how he and his wife want to adopt R.T. and how much they care for, and love, him. He described how he has stable employment and how his wife, who used to run a day care out of their home, gave up her profession so that she and her husband could become licensed foster care providers.[1] The uncle further testified that although they receive approximately $600 from the state each month for R.T.'s care, his wife used to make approximately $2,000 a month prior to discontinuing the day care service. According to the uncle, he and his wife were happy to sacrifice some of their household income to care for R.T.

---

[1] The uncle testified that they were informed that they could not become licensed as foster care providers if they also owned a day care business.

**{¶13}** The uncle explained that P.P. has had issues his entire life with maintaining employment and stable living arrangements. He stated that his brother was often out of work and had been living in a trailer in the backyard of their mother's home for years, until he, as their mother's power of attorney, convinced the mother prior to entering a nursing home to deed P.P. title to her home so that he would have a place to live free and clear of any mortgage obligation. The brother further described instances throughout P.P.'s adult life where P.P. would ask his family members and parents for money and then get angry if they refused to, or could not, give him any.

**{¶14}** His relationship with his brother worsened, explained the uncle, over the pendency of R.T.'s case because of P.P.'s conduct around his family. According to the uncle, P.P.'s visitations with R.T. at his home had to be discontinued and moved elsewhere because P.P. would use inappropriate language and swear around his six-year-old nephew, despite being asked to stop. P.P. would also tell the six-year-old not to get used to having R.T. around because R.T. was not going to live with them for very long — upsetting the child who at that point was bonded to R.T. According to the uncle, P.P. would get angry with him and his wife and speak badly about them to family members.

{¶15} The uncle testified that he is concerned that his brother could not care for R.T. and keep him safe. In support of his concerns, he related two incidents that occurred during P.P.'s visits with R.T. at their mother's residence, whereby P.P. allegedly sprayed R.T.'s hands with 409 kitchen surface cleaner in an attempt to wash the child's hands before feeding him lunch, and another where P.P. let R.T. remove a container of A-Jax cleaner from under the sink and play with it as a toy. The uncle testified that he had to intervene in both instances and P.P. got defensive and angry.

{¶16} Lastly, the uncle testified that he and his wife would like to adopt R.T. rather than simply seek legal custody because R.T. requires special treatment for his sensory issues and may require further treatment for autism. The uncle explained that as legal guardians, they would be unable to secure the necessary insurance provider that they would need to ensure that R.T. has access to proper treatment options. The uncle further explained that P.P. has been difficult to work with when it comes to ensuring R.T. gets the proper care, so they do not want to have to seek P.P.'s consent for future treatment.

**{¶17}** The state's final witness was the aunt. She testified extensively about the day-to-day care that she gives R.T., his schedule, and his medical needs. She explained how she first came to realize that R.T. was having sensory issues, how she worked with CCDCFS to get him into treatment, and how he is progressing through his treatment. According to her testimony, she is also concerned that P.P. cannot provide a safe and healthy environment for R.T. if he was awarded custody of the child. She stated her concerns that P.P. either does not understand R.T.'s special needs or is not motivated to address them. The aunt testified that her first attempt at getting treatment for R.T. occurred when he was seven months old and having prolonged, intense screaming fits. According to her testimony, R.T. did not begin his therapy for several months while they waited for P.P. to sign the necessary papers allowing for treatment.

{¶18} Kathleen Steponick was the first witness to testify on P.P.'s behalf. She testified that she works at Ohio Guidestone as a supportive visit coach and as part of her job, she attends weekly visits between parents and their children. During the visits, she attempts to facilitate the parent/child interaction, and empower parents to engage in active parenting and to recognize the needs of their children. Steponick explained that she had the pleasure of facilitating several of P.P.'s early visits with R.T. According to her testimony, P.P. brought toys, a blanket to play on, and other baby essentials to the visits. He told R.T. stories, sang to him, and provided for all of the child's needs during the visits. Overall, Steponick saw no problems with P.P.'s interactions with R.T., felt that P.P. was always appropriate with his son, and that their interactions demonstrated a "wonderful engagement." Steponick stated, however, that P.P.'s feelings seemed to become more negative towards his family members, but those feelings were not directed at R.T. Steponick believed that P.P.'s negative feelings were the result of his having anticipated being able to spend more time with his son at his brother's home, but was unable to do so because of the brother's family parameters. She acknowledged that she observed some negativity between P.P. and his brother and social workers, but that she never found the negativity to be unusual or abnormal. According to Steponick, she has found that many parents in P.P.'s position express a certain degree of negativity — usually directed toward the county or social worker — because of inherent bad feelings that can arise from having a child removed from their custody.

{¶19} In addition to Steponick, P.P.'s therapist, parenting coach, and potential future employer each testified on his behalf. The testimony revealed that P.P. regularly attends therapy sessions and is actively engaged in his therapy plan and working on its objectives, and that P.P. voluntarily participated in, and completed, a building strong families and parent empowerment class.

{¶20} Benjamin Rosolowski, who testified as a potential future employer of P.P., explained that he is a business owner who has hired P.P. in the past as an independent contractor to do carpentry, drywall, plumbing, and yard work at rental properties that he owns. According to Rosolowski, P.P. is a skilled tradesman and that in his time employing him he has never had any issues with P.P. showing up or failing to do a good job. Because of this, he testified that he recently offered P.P. full time employment for $10 an hour.

{¶21} P.P. testified that he believes Shauna Young never liked him and blames him for what happened to his son. He further testified that the reasons things became strained with his brother and his brother's family is because of how they treated him when he tried to visit his son at their home. According to P.P., the first time he visited R.T. at his brother's house, his sister-in-law, who was holding R.T., walked out of the room with the baby. P.P. explained that he did not know what else to do so he followed her into the kitchen and made an excuse to wash his hands. Finally, he asked his sister-in-law if he could hold his son and she said, "oh, well, yeah now that you've washed your hands."

**{¶22}** According to P.P., all of the visits with R.T. at his brother's home had this same "standoffish" air where he felt like he was purposely being pushed out of his son's life. He described other incidents where he would visit his son and his sister-in-law would ignore his requests to hold R.T., so he would take the child from her. P.P. further recalled a visit at his brother's home where he and his brother helped put R.T. to bed around 7:30 p.m. while his sister-in-law was not home. P.P. said that he stayed at the home visiting with his brother until his sister-in-law returned around 10 p.m. P.P. stated that he received a phone call from Young the next morning telling him that she was suspending one of his visits and that he was not allowed to go over to his brother's home outside of visitation times, and threatened to suspend visitation all together if there were any problems with this restriction.

**{¶23}** According to P.P., his relationship with his brother and his brother's family declined thereafter. P.P. stated that his brother acted like he did not want him in his home. P.P. also stated that he felt like once his brother began fostering his son, he tried to push P.P. out of his life. P.P. explained that he feels like he knows nothing about his son because his brother and sister-in-law hardly tell him anything about his treatment. He stated that he has never been made aware of when his son has doctor appointments, what doctors treat him, or the day care he attends. According to P.P., whenever he has called and asked for answers, he was either ignored or his brother would send a text saying that R.T. was fine. By way of explanation, P.P. described a time to the court when he noticed that R.T. had severe diaper rash. He became concerned and showed Young. When he did not receive any explanation from his brother for why the rash was so bad, his mother suggested that it could be that R.T. was not being properly changed at the day care.

**{¶24}** P.P. further testified that his brother's comments about his past living situations and employment were unfair and incomplete. According to P.P., he had been in ill health for several years prior to being deeded his mother's home. He stated that the cause of his ill health was a parasitic infection that remained undiagnosed despite several trips to the doctor. P.P. explained that the parasites caused him to lose large amounts of weight and weakened him to the point of not being able to do his contractor work. When P.P. became aware of the cause of his illness, he sought immediate medical treatment at Metrohealth Medical Center. According to P.P., he was placed on medication that caused the parasites to leave his body. He explained that thereafter, he slowly regained weight and the stamina he lost. He began seeking employment again. P.P. testified that he did not seek follow-up medical treatment because he felt better and had no more problems.

**{¶25}** P.P. testified that contrary to Young's testimony, he made approximately $22,000 in 2015 through his contract work. He explained that the $7,000 yearly income reflected in his 2015 tax return represented only the portion of his income that he received from working temporarily for five months at a factory. P.P. explained that he plans on updating his 2015 taxes to report the income from his independent contract work and further testified that Young was aware of his income from the receipts that he provided to the agency. According to P.P., he used a large portion of this income to make improvements to his home — including purchasing a new furnace, installing new duct work, and installing a new roof. P.P. also explained that he likes the idea of working full-time for Rosolowski and intends to take the job Rosolowski offered him.

**{¶26}** P.P. explained to the court that he did not believe Young was reporting the updates he was making on his home or the progress he was making in getting his utilities paid off and turned back on. Because of this, and because he felt that Young was generally harassing him, P.P. requested that Young's supervisor also attend the final, January 2016 house inspection. According to P.P., he made Young and her supervisor go from room to room and look at every heating duct and also touch every heating duct. P.P. testified that he made them do this because they did not want to do their job, which to him included looking at and touching every heating duct. According to P.P., his intent was only to make sure that the supervisor knew that he had working heat. P.P. believed that Young might lie to the agency in that regard, because he believed that she had not been truthful in other respects about his case.

**{¶27}** Lastly, P.P. testified that the 409 and A-Jax incidents did not happen quite like his brother stated. P.P. explained that he believed that the 409 cleaner was only soap, or a product similar to soap, when he used it to wash R.T.'s hands. According to P.P., he also did not spray the 409 cleaner directly onto R.T.'s hands but sprayed it on a rag first and then wiped the child's hands. P.P. further explained that although he did let R.T. momentarily play with a container of A-Jax while he was watching him, the container was newly purchased, had not been opened, and was still covered in its plastic factory wrapping.

**{¶28}** Amy Nash, R.T.'s guardian ad litem, was the final witness. She testified that she was assigned to R.T.'s case shortly after R.T. was born and CCDCFS filed for emergency custody. After meeting with P.P. and visiting his home, Nash initially recommended in her November 2015 guardian ad litem report that CCDCFS be denied permanent custody and that R.T. be placed with his father. Nash explained that she initially recommended reunification, because of P.P.'s success in completing his case plan and because his house seemed fit for the child. She also testified that it was apparent that P.P. loved his son very much and that there was a bond between R.T. and his father.

{¶29} At the hearing, Nash changed her recommendation and stated that granting permanent custody was in the best interest of the child. Nash justified the change by explaining that she had only recently gotten the opportunity to visit R.T. in the aunt and uncle's home because the family's holiday schedule made meeting them difficult. According to Nash, R.T. is very integrated into his aunt and uncle's home and it is clear that R.T. thinks of the aunt as his mother. Nash stated that R.T. climbs on her and likes to be near her, and that any sensory issues or issues that R.T. might have with not wanting to be touched, are not apparent when he is with the aunt. Nash further described how R.T. plays alongside his 18-month-old cousin and how the family appears to get along well. Nash stated that she respects P.P. and applauds him for the progress he made on his case plan and getting his house finished and set up for R.T., but believes that permanent custody is best for the child because he is integrated into the foster relatives' family.

**{¶30}** Following the permanent custody hearing, the court scheduled another hearing for later in the month for disposition of the case. At the hearing, the court announced its decision to award permanent custody to CCDCFS so that R.T. could be adopted by the aunt and uncle. The court pointed out that P.P.'s compliance with his case plan had no bearing on its decision to award permanent custody and that its decision was based solely on what it believed was in the best interest of the child. In support of its decision, the court pointed out that R.T. had been in the temporary custody of CCDCFS for more than 12 months out of a 22-month period and therefore the only thing left to consider was the child's best interest. The court stated that it duly considered the guardian ad litem's recommendation that permanent custody was in the child's best interest because the child was so integrated into the home of his aunt and uncle and because the aunt and uncle had good reasons for wanting to adopt R.T. The court further stated,

> The court wants to emphasize how rare those reasons actually are. Normally you hear things like, I want to help the parents. I don't want my blood relatives going to foster care. I'll do it if I have to, I've heard that before. Rarely do we hear the foster parents come in and focus exclusively on the needs and the well being of the child.

**{¶31}** The court then spoke at length about the financial sacrifices that the aunt and uncle made when the aunt discontinued her day care business to care for R.T. The court also noted the adjustments they made to their daily lives to care for a child with special needs.

**{¶32}** The court went on to state that it found all of the state's witnesses to be credible and persuasive. The judge further stated on the record that she did not find P.P. to be a credible witness because she felt like he blames Young and his sister-in-law for not having custody of his child. Further, in support of her decision, the judge pointed out P.P.'s admission that he is "clueless about [R.T.'s] life." The court also focused on the fact that P.P. had once denied that his child had special needs and, according to the aunt, did not sign certain papers required for R.T.'s placement in a special treatment program for several months, thus preventing him from receiving needed care. The judge further discussed and focused on the fact that the uncle had concerns about P.P.'s ability to keep R.T. safe and protect him on a daily basis, and stated that the court had the same concerns. Testimony that the court found particularly troubling was P.P.'s admission that he was ill for years with parasites but did not seek follow-up medical treatment after watching the parasites leave his body. Because of this, the court found that all the best interest of the child factors under R.C. 2151.414(D)(1) were met. In its journal entry, the court expressed the same reasons for awarding permanent custody to CCDCFS that it articulated at the hearing, but also stated that even if R.T. had not been in the temporary custody of the agency for 12 out of 22 months, R.T. could not be placed with P.P. because the child has special needs which P.P. is unable to meet.

**{¶33}** In his first assignment of error, P.P. argues that the trial court's decision to award permanent custody to CCDCFS was not supported by the evidence. Specifically, P.P. argues that the state presented no evidence that R.T. either could not be placed with P.P. within a reasonable time, or should not be placed with him, and that this was a factor that the court had to find before granting an award of permanent custody. Essentially, P.P. argues that the trial court erred as a matter of law by failing to follow the statutory requirements of R.C. 2151.414 when granting permanent custody to the agency. We disagree.

**{¶34}** R.C. 2151.414 governs the court's procedures and evidentiary requirements for hearings on motions for permanent custody. Pursuant to subsection (A) of the statute, a court must hold a hearing on a motion for permanent custody brought under R.C. 2151.413. In this case, CCDCFS was required to file a motion for permanent custody because of the length of time R.T. had been in temporary custody of the agency. *See* R.C. 2151.413(D)(1) (stating, in relevant part, "if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, the agency with custody *shall file* a motion requesting permanent custody of the child" (Emphasis added.)).[2]

---

[2] We note that an agency shall not file a motion for permanent custody under R.C. 2151.413(D)(1) if any of the factors in division (D)(3) of that section apply. These factors are: 1) the agency documents in the case plan a reason that permanent custody is not in the best interest of the child at that time, 2) the agency has not provided services required by the case plan to ensure the safe return of the child to the parent, 3) the agency has been granted permanent custody of the child

{¶35} Division (B) of R.C. 2151.414 provides the evidentiary requirements for granting a motion for permanent custody. Pursuant to this division, before a trial court can terminate parental rights and grant permanent custody to a county agency, the court must find by clear and convincing evidence: (1) the existence of any one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e), and (2) that granting permanent custody to the agency is in the best interest of the child.

{¶36} Division (B) provides:

(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

already, or 4) the child has been returned to the parent's home. If any of the stated factors apply, the agency can file two separate requests to extend temporary custody for six months when nearing the deadline for filing for permanent custody. *See* R.C. 2151.415(D)(1)-(4). Here, CCDCFS filed one motion to extend temporary custody in February 2015, on its recommendation that permanent custody was not in the best interest of the child at that time. When the six month extension elapsed, the agency filed a motion for permanent custody pursuant to R.C. 2151.413(D)(1) and declined to file a second motion to extend temporary custody.

(a)  The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b)  The child is abandoned.

(c)  The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d)  The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e)  The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

(2)  With respect to a motion made pursuant to division (D)(2) of section 2151.413 of the Revised Code, the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.

{¶37} Because R.T. had been in the custody of CCDCFS for 12 months out of a consecutive 22-month period (which also served as the basis for the state's motion for permanent custody under R.C. 2151.413(D)(1)), was not abandoned or orphaned, and neither he nor any other children previously in P.P.'s custody had been adjudicated abused, neglected, or dependant on three separate occasions, the only applicable provision for granting permanent custody in R.T.'s case was (B)(1)(d). As set forth in the statute, the court may grant permanent custody under R.C. 2151.414(B)(1)(d) if the court finds by clear and convincing evidence that R.T. was in the temporary custody of CCDCFS for 12 months out of a consecutive 22-month period, and that the grant of permanent custody is in the best interest of the child. The court was not required to consider whether R.T. could be placed with his father within a reasonable time, or whether he should be placed with his father because those considerations are only applicable to division (B)(1)(a) of R.C. 2151.414.

**{¶38}** Nevertheless, in its journal entry, the court did state that it made its decision after finding that both R.C. 2151.414(B)(1)(a) and (d) were met. However, the court made the finding under (B)(1)(a) in the alternative by stating "even if the child had not been in the temporary custody of the agency, he cannot be placed with either of the parents within a reasonable time or should not be placed with the parents." The court's over inclusiveness appears to have caused some confusion, such that in his brief, P.P. argues that R.C.2151.414(B)(1)(a) requires that the court find that permanent custody is in the best interest of the child, that the child cannot or should not be placed with the parent in a reasonable time, *and* that the child has been in the temporary custody of the agency for 12 months out of a consecutive 22-month period. This is incorrect.

**{¶39}** Division (B)(1)(a) states that if a child is not abandoned or orphaned and *has not been* in the temporary custody of the agency for 12 months out of consecutive 22-month period, then, in order to award permanent custody, the court must find that the child cannot be placed with the parent within a reasonable amount of time or should not be placed with the parent, and that permanent custody is in the best interest of the child. Thus, (B)(1)(a) does not apply where the child *has been* in the temporary custody of the agency for 12 months out of a consecutive 22-month period. Because the court found by clear and convincing evidence that R.T. was in the temporary custody of the agency for 12 months out of a consecutive 22-month period, the court could not consider division (B)(1)(a) when deciding whether to grant permanent custody. Although we recognize that the court did consider (B)(1)(a), we find no error because the court did this in the alternative while also making its finding under R.C. 2151.414(B)(1)(d).

**{¶40}** It also appears from his citing to *In Re Brofford*, 83 Ohio App.3d. 869, 615 N.E.2d 1120 (10th Dist.1992), that P.P. may be conflating the current version[3] of R.C. 2151.414 with the version of the statute in effect 30 years ago. When *Brofford* was decided, the version of R.C. 2151.414 in effect at that time stated:

---

[3] We note that the general assembly amended sections of R.C. Chapter 2151 through its enactment of 2015 H.B. 158, which became effective October 12, 2016. Aside from the amendment of the term "mental retardation" to "intellectual disability" in R.C. 2151.414(E)(2), the current version of R.C. 2151.414 is exactly the same as the version in effect at the time of the hearing and decision awarding permanent custody in this case.

(B) The court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

> (1) The child is not abandoned or orphaned and the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents;
>
> (2) The child is abandoned and the parents cannot be located;
>
> (3) The child is orphaned and there are no relatives of the child who are able to take permanent custody.

{¶41} Through a series of amendments, the general assembly added the additional subsection allowing for the court to find that the child had been in the agency's custody for 12 months out of a consecutive 22-month period when determining whether to grant permanent custody.[4] Therefore, it appears that P.P. has created his own hybrid version of R.C. 2151.414 which incorporates parts of the pre-amended statute and the current statute. The hybrid version would require that the court consider not only the best interest of the child and whether the child has been in temporary custody for 12 out of 22 months, but also whether the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. This is not an accurate reading of the current statute. Under the current version, once the court finds that a child has been in the temporary custody of CCDCFS for 12 months out of a consecutive 22-month period, the court need only consider whether an award of permanent custody is in the best interest of the child before ruling on the motion. Accordingly, we overrule P.P.'s first assignment of error.

---

[4] In conjunction with its amendments to R.C. 2151.414(B), the general assembly also amended R.C. 2151.413 by adding division (D)(1) which requires that the agency file for permanent custody when the child has been in the temporary custody of the agency for 12 months out of a consecutive 22-month period.

**{¶42}** In his second assigned error, P.P. contends that the trial court erred when it found that an award of permanent custody to CCDCFS was in the best interest of the child. Our standard of review on appeal from a determination of the best interest of the child in a permanent custody case is whether the juvenile court abused its discretion. *In re M.S.*, 2015-Ohio-1847, 34 N.E.3d 420, ¶ 31 (8th Dist.). "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). The term "abuse of discretion" means that the court exercised its discretion "to an end or purpose not justified by, and clearly against, reason and evidence." *State v. Ferranto*, 112 Ohio St. 667, 676, 148 N.E. 362 (1925).

**{¶43}** When determining whether the best interest of the child is served by an award of permanent custody to the agency, the court is instructed to consider factors outlined in R.C. 2151.414(D). This division states:

> (1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
>
> > (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
> >
> > (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

For the purposes of division (D)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

{¶44} Additionally, when determining whether to grant a motion for permanent custody, the court shall not consider the effect that granting permanent custody to CCDCFS would have on any parent of the child. R.C. 2151.414(C).

**{¶45}** In its journal entry granting permanent custody to the agency, the trial court stated that it considered all of the factors in R.C. 2151.414(D)(1) when making its decision.[5] However, some of the specific reasons the court provided in support of its decision, both on the record and in its journal entry, do raise concerns about whether the court accurately recalled witness testimony and whether the court was improperly considering the effect that granting permanent custody would have on the aunt and uncle foster parents who intend to adopt R.T.

**{¶46}** For instance, the finding that P.P. was not a credible witness appears to be based on the court's impression that P.P. blamed the social worker, his sister-in-law, and his attorney for not having custody of R.T. Upon review of the record, we can find no instances where P.P. ever blamed anyone for not having custody of his child. At most, P.P. articulated some resentment towards his social worker and his brother's family. However, this resentment, even if misplaced, was based on his perceptions of how these individuals treated him during the course of the case, not because he believed they were to blame for his lack of custody.

---

[5] The statute does not require the trial court to expressly note the R.C. 2151.414(D)(1) factors it found applicable before making its determination that permanent custody is in the child's best interest. Instead, it is enough for the trial court to state that it considered the statutory factors when making its determination. In such cases, appellate review is limited to whether any of those considerations weigh in favor of permanent custody and are supported by competent, credible evidence in the record. *See In re B.M.*, 8th Dist. Cuyahoga No. 96214, 2011-Ohio-5176, ¶ 28-30, citing *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, and *In re I.M.*, 8th Dist. Cuyahoga Nos. 82669 and 82695, 2003-Ohio-7069. Further, the court stated on the record at the disposition hearing that it found that all of the R.C. 2151.414(D)(1)(a)-(e) factors weighed in favor of awarding permanent custody to CCDCFS.

**{¶47}** Moreover, the court noted in its journal entry that the court's notes reflect that P.P. stated, with regard to his son, that "I'm clueless about his life." While P.P. did make that statement in his testimony, he did so in the context of describing the ways in which his sister-in-law and brother excluded him from R.T.'s life and did not inform him about R.T.'s therapy treatments and medical care. The way in which the trial court quoted P.P.'s statement, without offering P.P.'s surrounding explanation, took the statement completely out of context and distorted its meaning. The discussion went as follows:

Q: In the past two years have you been made aware of when your son's doctor's appoints are?

A: Not at all. I have no idea what doctors he goes to. Where he goes to day care. What he's doing. Why is his face full of rug burn. Why does he have a diaper rash constantly. I've no idea what is going on with my son, and I call, and call and try to get an answer with my brother just with a text saying he's fine [sic].

Q: Have you brought issues such as his face being scratched and his diaper rashes to the attention of your brother or the social worker?

A: Sometimes I will send a text and say, what happened? Just last week I showed Ms. Young his very severe diaper rash, but my mother helped me realize that it could possibly be the day care that's not changing him well. I'm just clueless about his life.

Q: Do you know anything about his [sic] Galvin Institute that has been mentioned today?

A: I have heard Ms. Young say it once or twice. And when I ask about it, she pretty much vaguely describes what's going on for his autism.

Q: Were you made aware of when he would be assessed or evaluated by this Institute?

A: The social worker or my brother tells me nothing. Nobody tells me anything about my son.

**{¶48}** We note also that the record to some extent supports P.P.'s statements about not being informed of his son's therapy treatments and medical care. For instance, although R.T.'s special needs and sensory issues presented when R.T. was around seven months old, P.P.'s case plan for reunification did not include, and was never amended to include, a plan for him to participate in his son's therapy sessions, attend his son's doctor appointments, or participate and learn more about the organizations and institutions that the aunt and uncle engaged to provide support to his son. Additionally, because the case plan only allowed for P.P. to visit R.T. once a week for two hours,[6] with the threat that visitations would be taken away if P.P. attempted to visit R.T. outside of these times, it is unclear how P.P. could have participated in this aspect of his son's life without it being included in his case plan. Accordingly, we believe that the court's consideration of P.P.'s statement that he is clueless about his son's life was improper in the context of its best interest analysis.

---

[6] According to the case plan for reunification, this visitation restriction was initially imposed at the outset of the case because P.P. had a history of drug use and still needed to undergo drug treatment. Once P.P. completed his drug treatment objectives however, which included his consistently not

**{¶49}** It is also unsettling that the court considered the financial sacrifices that the aunt and uncle made when they chose to close their day care business in order to become licensed foster parents, and the changes they made to their daily lives to accommodate R.T.'s treatment schedule. The court's journal entry does not explain why it chose to focus on the foster parent's efforts and sacrifices while ignoring P.P.'s efforts. If the court was suggesting that the foster parents' sacrifices — particularly the financial ones — would be wasted or go uncompensated if the agency was not awarded permanent custody, such a consideration is improper under division (C) of R.C. 2151.414 that explicitly states that courts cannot consider the effect that awarding permanent custody would have on *any parent* of the child. Here the aunt and uncle were regarded by CCDCFS and the judge as the prospective adoptive parents if an award of permanent custody were granted. Although R.C. 2151 et seq. does not define the term "parent," it is reasonable to conclude that in this instance, the foster parents seeking to adopt, are included within the meaning of "any parent" under R.C. 2151.414(C).

---

testing positive for drugs, the agency never amended P.P.'s visitation to give him more time with his son.

{¶50} To the extent that the court mentioned the aunt and uncle's financial and personal sacrifices as evidence of their commitment to R.T., we point out that P.P. also showed his commitment to his son, personally and financially, by updating his home, never missing a visitation, and by working through his case plan to complete all of the objectives required of him. Therefore, the one-sided mention of the foster parents' sacrifices, shows little to support the trial court's finding that permanent custody was in R.T.'s best interest.

{¶51} Lastly, in its journal entry, the court stated that it shared the uncle's concerns about whether P.P. could keep R.T. safe on a daily basis. In support of this concern, the court discussed how P.P. admitted to not receiving follow-up medical care once he rid his body of a parasitic infection that caused him to be ill for some time. Once again, the court takes P.P.'s statements out of context. According to P.P.'s testimony, when he was ill, he sought medical treatment numerous times, however the cause of his condition went undiagnosed by medical professionals. When P.P. became aware of what the actual cause of his illness might be, he sought immediate medical treatment and explained his reasons for believing that he had a parasitic infection. The doctor then prescribed medication that caused the parasites to leave his body, and alleviated his illness. Although the state asked P.P. whether he received follow-up medical care, there was never any indication from P.P., a physician, or any other medical professional, that would suggest any follow-up care was necessary. Accordingly, the court had no basis for drawing the conclusion that follow-up medical care was necessary in P.P.'s case.

{¶52} Despite the aforementioned issues with the trial court's findings, this court's standard of review requires us to determine whether the trial court abused its discretion in awarding permanent custody to CCDCFS. This is a decidedly deferential standard. *See In Re Cl.P.*, 8th Dist. Cuyahoga Nos. 96103, 96104, and 96105, 2011-Ohio-3475, ¶ 14 (stating, "'[i]f some competent, credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court.'" quoting *In re Myers*, 4th Dist. Athens No. 03CA23, 2004-Ohio-657, ¶ 7.). And notwithstanding our concerns over some of the court's reasoning, we do find that there was competent, credible evidence in the record to support the court's conclusion that permanent custody to the agency is in R.T.'s best interest.

{¶53} To begin, when looking at the first consideration under R.C. 2151.414(D), which is the interaction and interrelationship of the child with the child's parents and foster caregivers, the evidence shows that R.T. maintains a strong connection to his foster family, and to the aunt in particular. Amy Nash, R.T.'s guardian ad litem, testified that R.T. is deeply integrated into his foster family's home and considers the aunt — who had provided for his daily needs since he was two months old — to be his mother. Nash testified that R.T. climbs all over the aunt and appears to be deeply bonded to her. Because of this, Nash recommended that R.T. be placed in the permanent custody of the agency so that he could be adopted by his foster parents. Moreover, the evidence does raise some concerns over whether P.P. can provide a safe and stable environment for his

son. Although, the 409 cleaner incident may have been less egregious than initially presented once it was explained further, the fact remains that P.P. did not recognize that kitchen surface cleaner is not hand soap, and as such, is not an acceptable product to use on an infant's/toddler's hands. Additionally, although P.P. made tremendous progress in updating his home, securing working utilities, and finding steady employment[7] once R.T. was born and a reunification plan was in place, the facts show that P.P. had exhibited little interest in maintaining secure finances and legal, working utilities in his home prior to this time. Even though one might conclude that R.T.'s birth motivated P.P. to get his life on track, it is equally reasonable for the court to conclude that P.P. could revert to his old standard of living once R.T. is placed with him and the oversight of his reunification plan ceases. This determination is better left to the trial court that heard the evidence. We cannot say that the court's concern that P.P. would fail to provide a safe and secure environment for R.T. was unreasonable.

{¶54} Lastly, with regard to R.T.'s interactions with the family, the uncle gave competent and credible testimony that P.P. lacked an appreciation for R.T.'s bonding with his foster family/relatives. The uncle testified that P.P. told his six-year-old nephew (the uncle's son), that he should not get used to living with R.T. and that this upset the nephew. The uncle's testimony establishes that P.P., at times, placed his own

---

[7] We note that at the time of the hearing, P.P. had only been offered employment that he stated he planned to accept.

desires/interests before his son's, which obviously included his bonding with, and connection to, his caregivers and relatives.

{¶55} While the court may have found that other factors under division (D) of R.C. 2151.414 weighed in favor of permanent custody, we need not address them here. As this court has previously stated,

> Although a trial court is required to consider each relevant factor under R.C. 2151.414(D)(1) in making a determination regarding permanent custody, "'no one factor is given greater weight than the others pursuant to the statute.'" *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, quoting *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Further, only one of the enumerated factors needs to be resolved in favor of an award of permanent custody for the trial court to terminate parental rights. *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17; *In re N.B.*, 2015-Ohio-314 at ¶ 53.,

*M.S.*, 2015-Ohio-1847, 34 N.E.3d 420, at ¶ 52.

{¶56} It is clear in this case that the trial court considered the factors in R.C. 2151.414(D), and in so doing found that it was in R.T.'s best interest to grant the request for permanent custody so that R.T. could be adopted by his foster parents. Our review establishes that the record contains competent and credible evidence that factor (D)(1)(a) weighs in favor of permanent custody, thus supporting the court's best interest determination.[8]

---

[8] While we acknowledge this court's case law which states that only one R.C.2151.414(D)(1) factor need be resolved in favor of an award of permanent custody for the trial court to terminate parental rights, we cannot say that this applies, without exception, to every permanent custody case. As discussed in the analysis of the first assignment of error, R.C. 2151.413 and 2151.414 have undergone significant amendments over the last few decades. As a result of these amendments, county agencies are now required, with some exceptions, to file a motion for permanent custody when a child has been in the temporary custody of the agency for 12 out of a consecutive 22-month period.

{¶57} The decision to terminate a parent's right to raise his child is one of the most difficult decisions a trial court has to make. Indeed, the highest court in this country has stated that "the interest of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by this Court[,]" *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct 2054, 147 L.Ed.2d 49 (2000), and Ohio has long recognized that "the right of a natural parent to the care and custody of his children is one of the most precious and fundamental in law." *In re Adoption of Masa*, 23 Ohio St.3d 163, 492 N.E.2d 140 (1986). Not surprisingly, because of this, Ohio courts have consistently referred to the permanent termination of parental rights as "'the family law equivalent of the death penalty in a criminal case.'" *See, e.g., In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991); *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061 and 103367, 2015-Ohio-4991, ¶ 35. The gravity of such a decision is neither lost on the trial

---

*See* R.C. 2151.413(D)(1). In such instances, if the court finds at the hearing on the motion for permanent custody that the child was indeed in the temporary custody of the agency for 12 out of 22 months, then the only finding left for the court to make is whether permanent custody is in the child's best interest. *See* R.C. 2151.414(B)(1)(d). In making this determination, the court must consider the factors in R.C. 2151.414(D)(1) and need only resolve one factor in favor of permanent custody. It is therefore troubling that one of the five factors in division (D)(1) requires the court to consider whether the child was in the temporary custody of the agency for 12 months out a consecutive 22-month period. We doubt whether a statutory interpretation that would allow trial courts to use only this consideration as support for a best interest determination in favor of permanent custody, could survive a constitutional challenge. Parents have a fundamental right to the custody of their children. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). This right "does not evaporate simply because they have not been model parents or *have lost temporary custody of their child to the State*." (Emphasis added.). *Id.* Accordingly, we question whether a county agency's filing for permanent custody upon reaching the 12-month temporary custody deadline would be sufficient, solely, for the court to make its best interest determination.

court nor this court. But in the end, the decision of what is in a child's best interest must prevail when that determination is based on competent and credible evidence. Accordingly, we cannot say that the trial court abused its discretion when it concluded that it was in R.T.'s best interest to be placed in the permanent custody of CCDCFS. With this decision, it is our hope that the parties can repair any strained relationships so that R.T. has the benefit of an entire loving family.

{¶58} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court — juvenile division to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MELODY J. STEWART, PRESIDING JUDGE

PATRICIA ANN BLACKMON, J., CONCURS;
ANITA LASTER MAYS, J., DISSENTS WITH SEPARATE OPINION

ANITA LASTER MAYS, J., DISSENTING:

{¶59} I respectfully dissent from the majority's disposition of this appeal. On the record before this court, I find that the juvenile court abused its discretion when it

determined that an award of permanent custody to CCDCFS was in the child's best interests.

**{¶60}** As the majority acknowledges, parents have a constitutionally-protected, fundamental interest in the management, custody and care of their children. *Troxel,* 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49. "'*We recognize, however, that termination of parental rights is "'the family law equivalent of the death penalty in a criminal case.'"* (Emphasis added.) *In re J.B.*, 2013-Ohio-1704, at ¶ 66, quoting *In re Hoffman,* 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. *V.C.,* 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 35.

**{¶61}** The majority comprehensively recites the erroneous factual conclusions relied on by the trial court to sustain the determination that an award of permanent custody to the agency was in the best interest of the child. Also recounted by the majority are the commendable efforts that P.P. has made to provide a home for his son and the trial court's focus on the efforts and sacrifices that the aunt and uncle have made to secure custody of R.T., in determining the best interests of the child.

**{¶62}** Notwithstanding the cited factual issues, the majority determines that the trial court's decision must be affirmed due to the existence of "competent, credible evidence going to all the essential elements of the case." *B.M.*, 8th Dist. Cuyahoga No. 96214, 2011-Ohio-5176, at ¶ 32. Thus, the majority agrees that the record demonstrates, by "clear and convincing evidence," the existence of the requisite statutory factors of R.C.

2151.414 (D). *In re S.D.*, 8th Dist. Cuyahoga Nos. 99410, 99411, and 99412, 2013-Ohio-3535, ¶ 10.

{¶63} The record supports P.P.'s efforts to insure that R.T. received proper care even prior to R.T.'s birth. P.P. actively pursued establishing paternity in spite of the signature on the birth certificate by the mother's boyfriend. It was at P.P.'s request that the agency considered, and awarded, temporary custody of R.T. to the uncle and aunt, while P.P. worked toward preparation for full-time parenting. The agency's case plan was to unite R.T. and P.P.

{¶64} P.P. inherited his parents's home and, as required by the case plan, completed substantial repairs including installation of a new furnace, hot water tank, flooring, roofing, electrical wiring, and effecting restoration of utilities. Testimony by Benjamin Rosolowski, who had previously hired P.P. and was prepared to offer P.P. employment, confirmed that P.P. is a skilled tradesman. The concern expressed at trial that P.P. did not engage in the home restoration activities prior to R.T.'s birth is irrelevant to the effort that P.P. has made since that point. In addition, P.P. explained that the successful treatment of a parasitic illness restored his health and energy, making him physically capable of the house restoration and employment.

{¶65} P.P. successfully completed a drug treatment program and subsequently tested negative for drugs. He also received mental health counseling for depression and anxiety. Not only did P.P. meet the case plan, he researched the availability of parenting

programs. As a result, he discovered and completed parenting programs such as the Father Head Program and Building Strong Families and Parents programs.

{¶66} Witnesses for both sides testified that P.P. has been consistently and actively engaged in preparing to care for R.T. Ms. Steponick of Ohio Guidestone, stated that the interaction between P.P. and R.T. was a "wonderful engagement." Young testified that P.P. had appropriate interactions with his son, that reports from the visitation coach were positive, and that P.P. was engaged and interested in learning to care for R.T., who runs to P.P. when he sees him and calls him daddy.[9]

{¶67} The record further demonstrates that, as the aunt and uncle grew more attached to R.T., the dynamics in their relationship with P.P. shifted. Rather than continuing with flexible visitation due to the familial relationship, the social worker informed P.P. that his visits were restricted to scheduled visitation. P.P. was not included in R.T.'s medical treatment plans and, when he questioned the aunt and uncle about a severe diaper rash, he did not receive an explanation. Thus, the objectivity of the testimony of the aunt and uncle regarding P.P., with a clear conflict of interest, must be considered in the determination of whether their testimony constitutes clear and convincing evidence supporting the award of permanent custody.

{¶68} The trial court determined that the sole, remaining issue was the best interest of the child, as the 12-month temporary custody threshold of R.C. 2151.414(D)(1) had been met. Though the record demonstrates reliance by the trial court on facts not in

---

[9] R.T. also refers to the uncle as daddy.

evidence, or otherwise misstated or misconstrued, the trial court determined that the award of permanent custody to the agency was supported by clear and convincing evidence, finding that "all" of the state's witnesses were credible, including the aunt and uncle. The trial court also determined that R.T. could not be placed with P.P. because P.P. is unable to meet his special needs.

{¶69} One six-month extension, in February 2015, was granted on the ground that permanent custody was not in the best interest of the child, to allow P.P. to resolve the $2,500 water and sewer utility situation. (See R.C. 2151.413(D)(3) allowing for two six-month extensions.) The agency filed for permanent custody at the end of the first extension. According to Young, by the time of trial, the utility issue had been resolved.[10]

{¶70} The record supports: (1) P.P.'s interest and concern for R.T.'s well-being, even prior to birth; (2) determination to establish paternity and assume custody of his son; (3) significant progress by P.P. in meeting the case plan requirements, including counseling, successful drug treatment, implementing home repairs, establishing utilities, and decorating a bedroom for R.T.; (4) P.P.'s independent participation in family instruction programs to better prepare him for fatherhood; (5) a happy relationship between P.P. and R.T.; (6) a reduction of his visitation time with R.T.; and (7) a lack of

---

[10] Young did express concern that, as time passed, P.P. was sometimes agitated or confrontational with her, the aunt and uncle, and that the behavior increased when the agency filed for permanent custody. It is offered here that the behavior may not be conclusively deemed unreasonable under the circumstances, as it began to appear that his efforts were in vain.

effort by the agency, aunt and uncle to educate or engage P.P. to care for R.T.'s special needs, or include him in R.T.'s medical appointments.

**{¶71}** All of the "credible" state's witnesses testified that the home was well-prepared and to the positive relationship between father and son. P.P.'s well-intentioned request for "temporary placement" of R.T. with his family, and P.P.'s family's love for R.T. is not questioned here. However, the "temporary placement" and connection to R.T. resulted in their testifying against P.P. to obtain permanent custody.

**{¶72}** In light of the significant evidence in favor of the denial of permanent custody at the time of trial, coupled with the lack of effort by the agency to educate P.P. for the purpose of assessing his ability to address R.T.'s special needs, I "cannot say that the record contains clear and convincing evidence that it is in the best interest of the [child] to be placed in the permanent custody of CCDCFS on these facts." *S.D.*, 8th Dist. Cuyahoga Nos. 99410, 99411, and 99412, 2013-Ohio-3535, at ¶ 24. ("It gives us great trepidation to consider that appellant's parental rights are to be terminated when a potentially viable reunification option has not been adequately explored." *Id*. at ¶ 23.)